301 Ga. 482
FINAL COPY

S17A0385.  WALKER v. THE STATE.

NAHMIAS, Justice.

Appellant Gregory Malik Walker, Jr., was convicted of malice murder and other crimes in connection with the shooting death of Roger Clark.  Appellant contends that the evidence was insufficient to support his convictions; that the trial court committed plain error in failing to charge the jury on voluntary manslaughter and defense of habitation; that the trial court abused its discretion in excluding testimony at trial and at the motion for new trial hearing; and that Appellant received ineffective assistance of trial counsel.  We affirm.[1]

---

[1]  Clark was killed on June 5, 2013.  On March 26, 2014, a Clayton County grand jury indicted Appellant for malice murder, felony murder, aggravated assault, aggravated battery, theft by taking a firearm, and three counts of possession of a firearm during the commission of a crime. At a trial from June 30 to July 3, 2014, the jury found Appellant guilty of all charges.  On July 18, the trial court sentenced him to serve life in prison without the possibility of parole for malice murder, ten concurrent years for theft by taking, and five consecutive years for one of the firearm possession counts; the court purported to merge the remaining verdicts.  On July 21, 2014, Appellant filed a motion for new trial, which he amended with new counsel on November 17, 2015.  After an evidentiary hearing on January 7, 2016, the trial court amended Appellant's sentence to reflect that the felony murder verdict was vacated by operation of law, and on March 25, 2016, the court denied Appellant's new trial motion.  He then filed a timely notice of appeal, and on July 21, 2016, the appeal was docketed in this Court as Case No. S16A1851.  Appellant filed a motion to remand the case to the trial court for completion of the record on appeal, which this Court granted on September 8, 2016.  On September 13, 2016, the trial court entered an order certifying the completeness of the record and directing the trial court clerk to transmit the record to this Court.  On October 12, 2016,

1.     Viewed in the light most favorable to the verdicts, the evidence at trial showed the following.  On April 29, 2013, Appellant agreed to buy a 2004 Ford Explorer SUV from Clark's wife for $3,000.  Appellant and Mrs. Clark signed a handwritten bill of sale reciting that Appellant had paid $1,800 toward the purchase price, that he would pay the remaining $1,200 by May 3, and that he understood and agreed that he was not yet the owner of the SUV.  Appellant told the Clarks that he needed to finance the $1,200 balance due through a title pawn, although he actually had enough cash to pay it.  During the first week of May, the Clarks accompanied Appellant to a title pawn store.  Mrs. Clark signed over the SUV's title to Appellant, who went into the store while the Clarks waited outside.  When Appellant came out, he said that the store was low on cash and that he would have to come back the next day to get the money.  He returned the title and bill of sale to the Clarks, who kept possession of the SUV.  Appellant never paid the balance due on the vehicle.

On May 9, Appellant called the police and reported the SUV stolen.  He then went with the police to the barbershop where Clark worked, and the police

the appeal was re-docketed in this Court to the term beginning in December 2016.  The case has been submitted for decision on the briefs.

2

allowed Appellant to leave with the SUV because the title was in his name; the police told Clark and Appellant that they had a civil dispute that needed to be resolved in court. A few days later, the barbershop owner noticed the SUV parked at the gas station next door. The owner then saw Appellant drive the SUV up close to the barbershop door, yell something insulting at Clark, who was inside working, and speed off when Clark began to walk outside.

On May 14, Appellant obtained ex parte temporary protective orders against the Clarks, and a show cause hearing was set for June 5. On May 15, Mrs. Clark filed a lawsuit against Appellant for repossession of the SUV and an application to have him arrested for taking possession of the SUV without making full payment. At the show cause hearing on June 5, the magistrate court dismissed the temporary protective orders for lack of evidence. The court also dismissed the application for arrest filed by Mrs. Clark but allowed her to serve Appellant with her repossession lawsuit. After the hearing ended at 1:00 p.m., Mrs. Clark drove Clark to the barbershop. Appellant drove the SUV to the apartment complex where he was living with his cousin, her husband, and their children. When the husband left with the children, Appellant stole his .380 handgun from a hiding place under a mattress and drove in the SUV to the gas

3

station next door to the barbershop where Clark worked.

Appellant arrived at the gas station around 2:00 p.m. He parked the SUV at one of the pumps closest to the barbershop, but with the gas tank on the opposite side from the pumps. The SUV's gas tank was almost full, and at no point did Appellant put gas into it. Instead, he went into the gas station convenience store for a couple of minutes and then stopped and spoke with a man in the parking lot before walking back to the SUV. As Appellant walked back to the SUV, he gestured to Clark, who was standing outside the barbershop talking on his cell phone. Appellant yelled at Clark, "try me now mother f**ker." Clark, who was unarmed and still on the phone, slowly walked over to the gas station and stood a few feet away from the SUV for 20 to 25 seconds. Clark told Appellant, "You should have said that in court, now you have to give me my truck back." When Clark got off the phone, he approached Appellant, who had opened the door of the SUV, removed the steering wheel lock, retrieved the stolen handgun and put the magazine in it, closed the door, and then remained outside the SUV.

The two men argued briefly about the vehicle. Appellant told Clark that he had a gun, and Clark said that Appellant would have to show it to him.

4

Appellant then stepped back, raised the gun, and shot Clark. Clark lurched forward to try to grab the gun, and Appellant began backing away while shooting Clark two more times. Clark was hit in the head, torso, and leg. He still tried to wrestle the gun away from Appellant, and both men fell to the ground; only Appellant got up. A bystander called 911, and the police arrived within minutes. Appellant was arrested at the scene. Clark was taken to a hospital and died from his injuries that evening.

At trial, associates of Appellant and Clark testified about the two men's interactions, and eyewitnesses from the gas station testified about the shooting and the events leading up to it. The jury also viewed surveillance videos from the gas station. A detective who interviewed Appellant after the shooting testified that Appellant denied making any statements to Clark right before the shooting and claimed that he went to the gas station to top off his tank and did not see Clark in the parking lot.

Appellant also testified, admitting that he shot Clark multiple times but claiming that he did so in self-defense. Appellant, who has Crohn's disease, said that Clark, who was younger and much bigger, had sent him threatening text messages about the SUV, and that he was worried that Clark might be

5

armed and was afraid for his life when he shot Clark. On cross-examination, Appellant acknowledged that he chose to go to the gas station next door to the barbershop about an hour after the June 5 court hearing, despite there being three other gas stations within close proximity. He also admitted that during the approximately 30 seconds when he was back at the SUV and Clark had not yet reached him, he could have called 911, gotten in the SUV and shut the door, or simply driven away, but he did not.

Appellant claims that the evidence presented at trial was insufficient to support his convictions, because in his view the evidence showed that Clark had threatened and acted aggressively toward Appellant and was moving toward Appellant when he shot. However,

> "[a]s we have explained many times before, conflicts in the evidence, questions about the credibility of witnesses, and questions about the existence of justification are for the jury to resolve." The jury is free to reject any evidence in support of a justification defense and to accept the evidence that the shooting was not done in self-defense.

Anthony v. State, 298 Ga. 827, 829 (785 SE2d 277) (2016) (citation omitted). When properly viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to authorize a rational

6

jury to find Appellant guilty beyond a reasonable doubt of the crimes for which he was convicted. See Jackson v. Virginia, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979).

2.     Appellant contends that the trial court erred in failing to instruct the jury on voluntary manslaughter as a lesser included offense of murder and on an alternate theory of justification in addition to self-defense, namely, defense of habitation. Because Appellant did not object on these grounds before the jury retired to deliberate, his claims may be reviewed on appeal only for "plain error." OCGA § 17-8-58 (b).

In State v. Kelly, 290 Ga. 29 (718 SE2d 232) (2011), this Court adopted the federal plain error standard, which has four prongs:

> First, there must be an error or defect — some sort of deviation from a legal rule — that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error – discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

Id. at 33 (citation, punctuation and emphasis omitted). "Satisfying all four prongs of this standard is difficult, as it should be." Id. (citation and punctuation omitted). Neither of Appellant's claims meets this test.

(a) Appellant's claim regarding a jury instruction on voluntary manslaughter falters at the first step of the plain error analysis. On the first day of trial, Appellant filed a request that the court give the pattern charge on voluntary manslaughter. However, at the charge conference after the close of the evidence, Appellant explicitly withdrew his request for a voluntary manslaughter instruction, both through his counsel and personally in a colloquy with the trial court. Thus, Appellant affirmatively waived any right to a voluntary manslaughter charge and cannot show plain error in this regard, and we need not address the remaining prongs of the plain error standard. See Brown v. State, 298 Ga. 880, 882 (785 SE2d 512) (2016). See also United States v. Rodriguez, 311 F3d 435, 437 (1st Cir. 2002) ("A party who identifies an issue, and then explicitly withdraws it, has waived the issue.").

(b) Appellant also has not shown that the trial court committed plain error by not instructing the jury on the defense of habitation theory of justification. OCGA § 16-3-24.1 defines a "habitation" to include a "motor

8

vehicle" like the SUV that Appellant obtained from the Clarks, and OCGA § 16-3-23 says that a person is justified in using deadly force to prevent or terminate another person's unlawful entry into a habitation only in three circumstances. Appellant focuses on the first and third circumstances enumerated, where:

> (1) The entry is made or attempted in a violent and tumultuous manner and [the person claiming justification] reasonably believes that the entry is attempted or made for the purpose of assaulting or offering personal violence to any person dwelling or being therein and that such force is necessary to prevent the assault or offer of personal violence; [or] . . .
> (3) The person using such force reasonably believes that the entry is made or attempted for the purpose of committing a felony therein and that such force is necessary to prevent the commission of the felony.

OCGA § 16-3-23 (1), (3).

Thus, among other things, for defense of habitation to apply in this case, there would need to be evidence that Clark was entering or attempting to enter the SUV at the time that Appellant shot him. However, as the trial court ruled in denying Appellant's motion for new trial, there was simply no evidence of an entry or attempted entry by Clark into the SUV when Appellant opened fire. There was testimony that Appellant opened the door of the SUV as Clark was walking over and that Appellant retrieved his gun from inside the SUV, but Appellant then closed the door and remained outside during the confrontation

9

with Clark. Thus, pretermitting whether Appellant affirmatively waived a jury instruction on defense of habitation in the course of his requesting other instructions on justification, he has not shown any error or defect in the proceedings given the lack of even slight evidence of the entry or attempted entry required for defense of habitation under OCGA § 16-3-23 (1) and (3). See Hicks v. State, 287 Ga. 260, 262 (695 SE2d 195) (2010) ("It is not error to refuse a justification charge where there is no evidence to support it.").[2]

3.    Appellant asserts that the trial court abused its discretion in excluding testimony by his father on the ground of hearsay. At trial, Appellant's

---

[2] Defense of habitation is an affirmative justification defense that is statutorily defined to be distinct from self-defense, which was the defense that Appellant raised at trial, that the State rebutted, and that the jury rejected. See OCGA §§ 16-3-21 (use of force in defense of self or others), 16-3-23 (use of force in defense of habitation), 16-3-28 ("A defense based upon any of the provisions of this article is an affirmative defense"). The United States Supreme Court recently held that under federal law, plain error cannot exist in relation to a non-jurisdictional affirmative defense (there, a statute of limitations defense) that is not put at issue at trial. See Musacchio v. United States, 577 U. S. ___, ___ (136 SCt 709, 718, 193 LE2d 639) (2016). The Court explained that "[w]hen a defendant fails to press [an affirmative] defense, the defense does not become part of the case," the government does not otherwise have the burden of disproving it, and thus "there is no error for an appellate court to correct — and certainly no plain error." Id. See also 7 Wayne R. LaFave et al., Criminal Procedure § 27.5 (c) (4th ed. Dec. 2016 update) (noting that "[n]ot every unraised claim will be reviewable for plain error," and citing Musacchio in support of the proposition that "[a]ffirmative defenses, for example, cannot be raised for the first time on appeal"). As mentioned above, in reviewing unobjected-to jury instruction claims for "plain error" under OCGA § 17-8-58 (b), this Court adopted the basic federal plain error standard. See Kelly, 290 Ga. at 33. Because Appellant's defense of habitation claim fails under that standard, we need not decide in this case whether we should follow Musacchio to hold categorically that a defendant cannot establish plain error in regard to a claim based on a non-jurisdictional affirmative defense that the defendant never put at issue at trial.

father testified that Appellant stopped by his house and "began to tell me that — ," at which point the State made a hearsay objection. In response, Appellant's counsel argued (incorrectly) that *all* out-of-court statements by Appellant were admissible, saying, "Any statement made by the defendant, Judge, is admissible."[3] The trial court sustained the State's objection.

This claim of error is not subject to ordinary appellate review. OCGA § 24-1-103 (a) (2) says:

> Error shall not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected and: . . . [i]n case the ruling is one excluding evidence, the substance of the evidence was made known to the court by an offer of proof or was apparent from the context within which questions were asked.

The substance of the out-of-court statements that Appellant sought to have his father recount was not apparent from the discussion at trial, nor was it made known to the trial court by an offer of proof. To the contrary, Appellant's counsel instructed the witness, "don't mention what [Appellant] said, okay." Accordingly, Appellant cannot obtain ordinary appellate review of this issue and

---

[3] Appellant's counsel appears to have been invoking OCGA § 24-8-801 (d) (2) (A), but that provision recognizes a blanket exclusion from the hearsay rule only for statements by a party-*opponent*, not for a party's out-of-court statements offered by the party himself.

11

instead is relegated to review only for plain error. See Lupoe v. State, 300 Ga. 233, 247 (794 SE2d 67) (2016).

Appellant's failure to make the evidence known to the court as required by OCGA § 24-1-103 (a) (2) all but dooms his claim under plain error review. As the United States Court of Appeals for the Tenth Circuit recently explained in applying the analogous federal rule of evidence:

> [A] lengthy analysis is generally unnecessary when an appellant challenging the exclusion of evidence failed to make an adequate offer of proof. As stated earlier, an offer is inadequate when it lacks the specificity necessary to determine whether the evidence would be admissible (so neither of the first two requirements of plain-error review is satisfied) or whether exclusion of the evidence prejudiced the appellant (so the third requirement is unsatisfied).

United States v. Harry, 816 F3d 1268, 1283 (10th Cir. 2016). See also Fed. R. Evid. 103 advisory committee notes on 1972 proposed rules ("In the nature of things the application of the plain error rule will be more likely with respect to the admission of evidence than to exclusion, since failure to comply with normal requirements of offers of proof is likely to produce a record which simply does not disclose the error.").

In this case, the lack of a proper offer of proof makes it impossible to

determine that the out-of-court statements that Appellant's father supposedly would have recounted would have been admissible at trial, much less that their admissibility was so "'clear or obvious'" as to be beyond "'reasonable dispute.'" Kelly, 290 Ga. at 33 (citation omitted). Likewise, without informing us what the alleged out-of-court statements were, Appellant cannot meet his burden to show that there is a reasonable probability that, but for their exclusion at trial, the outcome would have been more favorable to him. See Martin v. State, 298 Ga. 259, 277-278 (779 SE2d 342) (2015) (equating the third, harm prong of the plain error standard with the prejudice required to establish an ineffective assistance of counsel claim). See also United States v. Dominguez Benitez, 542 U. S. 74, 83 (124 SCt 2333, 159 LE2d 157) (2004) (holding that to establish plain error, "[a] defendant must . . . satisfy the judgment of the reviewing court, informed by the entire record, that the probability of a different result is 'sufficient to undermine confidence in the outcome' of the proceeding." (quoting Strickland v. Washington, 466 U. S. 668, 694 (104 SCt 2052, 80 LE2d 674) (1984))). Accordingly, this claim also fails under plain error review.

4. Finally, Appellant contends that his trial counsel provided ineffective assistance. An ineffective assistance claim premised on the quality

of the attorney's representation requires the defendant to prove both deficient performance and resulting prejudice. See Strickland, 466 U. S. at 687. To establish deficient performance, the defendant must show that counsel performed his duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms. See id. at 687-690. To establish prejudice, the defendant must show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. See also Woodard v. State, 296 Ga. 803, 810 n.5 (771 SE2d 362) (2015) (explaining that in the context of deciding whether a defendant has shown Strickland prejudice, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done). We need not address both components of the inquiry if the defendant makes an insufficient showing of either deficient performance or prejudice. See Strickland, 466 U. S. at 697.

(a) Appellant alleges that his trial counsel performed deficiently in five respects. He points first to his counsel's withdrawal of the request for a jury instruction on voluntary manslaughter. See Division 2 (a) above. But the

14

record supports the trial court's findings that counsel thoroughly discussed this issue with Appellant; that Appellant expressed his desire to pursue an all-or-nothing strategy of forcing the jury to choose between finding him guilty of murder or acquitting him by not giving the jury the option of finding him guilty of the lesser included offense of voluntary manslaughter; that counsel viewed this strategy as an appropriate avenue to pursue; and that counsel made the decision to withdraw the request for a voluntary manslaughter instruction.

Appellant has not shown that this strategic decision by his trial counsel, made after full consultation with Appellant, was unreasonable. "Decisions as to which jury charges will be requested and when they will be requested fall within the realm of trial tactics and strategy. They provide no grounds for reversal unless such tactical decisions are so patently unreasonable that no competent attorney would have chosen them." McLean v. State, 297 Ga. 81, 84 (772 SE2d 685) (2015) (citation and punctuation omitted). That the trial court also had a colloquy directly with Appellant to confirm that he had consulted with his counsel and that his views aligned with his counsel's decision on this important issue does not alter the analysis. See Van Alstine v. State, 263 Ga. 1, 4 (426 SE2d 360) (1993) (noting the importance of consultation between the

accused and his lawyer "in such vital matters as the decision whether to pursue an 'all or nothing' defense and whether to request the lesser included offenses the trial court may be willing to submit to the jury"). Accordingly, Appellant failed to show that his counsel performed deficiently in this respect.

(b) Appellant also points to his trial counsel's failure to request a jury instruction on the good character of the defendant. At the motion for new trial hearing, trial counsel was not asked why he decided not to request such an instruction, and in the absence of evidence to the contrary, counsel's decisions on jury charges are presumed to be strategic. See Jarvis v. State, 285 Ga. 787, 791 (683 SE2d 606) (2009). See also Strickland, 466 U. S. at 689 (noting that "the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy'" (citation omitted)). Under the circumstances of this case, trial counsel could have decided quite reasonably that an instruction focusing the jury's attention on Appellant's character would not advance his client's interests and in fact might backfire. Thus, Appellant failed to prove that his counsel's performance was deficient in this regard as well. Likewise, we cannot say that an instruction on good character would in reasonable probability have changed the outcome of the

16

trial, given the evidence against Appellant.  See <u>Sears v. State</u>, 292 Ga. 64, 71-72 (734 SE2d 345) (2012).

(c)    Appellant points next to his trial counsel's failure to offer into evidence Clark's prior misdemeanor conviction for carrying a concealed weapon to support Appellant's testimony that he had been told that Clark kept a gun in a drawer at the barbershop and that he thought that Clark might be armed on the day of the shooting, even though he did not see Clark with a weapon.  At the motion for new trial hearing, trial counsel was asked whether, in his opinion, Clark's prior conviction "would have been relevant to the defense of self-defense in this case," and he answered, "No."  When asked why not, counsel explained:

> Because based on my understanding of the facts and my contact with [Appellant] this was an isolated dispute between the defendant and the victim over the truck.  And so it didn't come out at the trial that the victim at the time of his encounter with [Appellant] had a weapon on his person so I didn't think it was relevant that he had been convicted on a prior occasion for having a misdemeanor concealed weapon on his person.

Putting aside whether the victim's prior act of which Appellant was unaware at the time of the confrontation would have been admissible, but see <u>Hendrix v. State</u>, 298 Ga. 60, 62 n.2 (779 SE2d 322) (2015); <u>Mohamud v. State</u>, 297 Ga.

532, 535-536 (773 SE2d 755) (2015), Appellant has not shown that this strategic decision by his counsel was patently unreasonable. See Brown v. State, 292 Ga. 454, 456-457 (738 SE2d 591) (2013) (reiterating that decisions as to what witnesses and other evidence to present are matters of trial strategy and are ineffective only if unreasonable ones that no competent attorney would make). Accordingly, Appellant has again failed to show that his trial counsel's performance was professionally deficient.

(d)     Appellant also points to his trial counsel's failure to subpoena his older brother or otherwise ensure that the brother would be present at trial to testify about Appellant's fear for himself and his family members based on text messages that the brother claimed to have seen on Appellant's cell phone. However, decisions regarding which defense witnesses to call are a matter of trial strategy. See Brown, 292 Ga. at 456-457. Moreover, we do not know what the alleged text messages said, because their substance was not proffered at the motion for new trial hearing. Without knowing what the text messages said, we cannot say that no competent attorney would have made the same decision under similar circumstances, particularly when Appellant testified at trial about alleged threats from and fear of Clark. See id. Similarly, given the lack of specifics

18

about the brother's testimony, we cannot say that its absence at trial in reasonable probability made a difference in the outcome, especially given Appellant's testimony about threats and his father's testimony that he told Appellant to take out a temporary protective order against Clark.[4]

(e)    Appellant points last to his trial counsel's decision not to pursue a jury instruction on the defense of habitation theory of justification. As explained in Division 2 (b) above, however, there was not even slight evidence to support such an instruction. Accordingly, Appellant has not shown that his counsel was deficient in not requesting it. See Coleman v. State, 286 Ga. 291, 298 (687 SE2d 427) (2009). Thus, Appellant's final ineffective assistance claim also lacks merit.

Judgment affirmed. All the Justices concur.

Decided June 19, 2017.

Murder. Clayton Superior Court. Before Judge Benefield.

---

[4] Appellant also separately enumerates as error the trial court's sustaining a hearsay objection to the brother's testimony about the content of the text messages at the motion for new trial hearing. But Appellant again failed to proffer the substance of the text messages for the record, cf. Division 2 (b) above, and in any event, a freestanding claim that an evidentiary error was made in a post-trial hearing cannot establish error affecting the trial.

John W. Kraus, for appellant.

Tracy Graham Lawson, District Attorney, Elizabeth A. Baker, Elizabeth Rosenwasser, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Mary C. Greaber, Assistant Attorney General, for appellee.